IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

WILLIAM B. NESMITH,                      )        CIVIL ACTION 4:06-533-RBH-TER
                                         )
              Plaintiff,                 )
                                         )
       v.                                )
                                         )        REPORT AND RECOMMENDATION
MICHAEL J. ASTRUE,[1]                    )
COMMISSIONER OF SOCIAL                   )
SECURITY,                                )
                                         )
              Defendant.                 )
_____)

       This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended,

42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of

Social Security, denying plaintiff's claim for Disability Insurance Benefits (DIB). The only issues

before the Court are whether the findings of fact are supported by substantial evidence and whether

proper legal standards have been applied.  This case was referred to the undersigned for a report and

recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).


                              **I.  PROCEDURAL HISTORY**

       Plaintiff, William B. Nesmith, filed applications for DIB on June 14, 2001, alleging disability

beginning February 14, 1999, due to back pain, shoulder pain, and hip pain. (Tr. 392-95. 405). His

applications were denied initially and upon reconsideration. (Tr. 361-64, 368-69). Plaintiff timely

_____

       [1]  Michael J. Astrue became the Commissioner of Social Security on February 12, 2007.
Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be
substituted for Commissioner Jo Anne B. Barnhart as the defendant in this suit.

filed a request for hearing. Following a hearing, the Administrative Law Judge (ALJ) issued an unfavorable decision. However, the Appeals Council granted plaintiff's request for review and remanded the case to the ALJ for further proceedings consistent with their order. (Tr. 199-202). After a second administrative hearing, the same ALJ issued a second unfavorable decision on January 28, 2005. (Tr. 16-35). As the Appeals Council denied plaintiff's subsequent request for review of the hearing decision on January 31, 2006, (Tr. 8-11), the ALJ's decision was the Commissioner's "final decision" for purposes of judicial review.

## II.  FACTUAL BACKGROUND

The plaintiff was born on October 10, 1958, and was 45 years of age at the time of the hearing before the ALJ on August 11, 2004. (Tr. 106). He has a high school education and past work experience as a longshoreman. (Tr. 406, 411).

## III.  DISABILITY ANALYSIS

Plaintiff asserts that he worked all of his adult life as a longshoreman at the port of Charleston. Plaintiff contends that he steadily increased his earnings to over $80,000 in the year 1998, with only a high school diploma. (Tr. 396-402). Further, plaintiff asserts he was very active in a number of pursuits at the same time as working as a longshoreman including small business ownership (a beauty salon), playing golf, showing dogs, and bodybuilding. On February 17, 1999, plaintiff was working on a shipping container when a guard rail gave way and he fell onto the deck of a ship. In an attempt to break his fall, he reached out, and injured his shoulders and back. Plaintiff never returned to work. (Plaintiff's brief, p. 3).

-2-

In his brief, plaintiff argues as follows:

1.   Given that plaintiff has proven severe impairments, did the Commissioner err in discounting his credibility without making any finding as to whether these impairments can be expected to produce his symptoms and without providing a sufficient rationale grounded in substantial evidence?

2.   Has the Commissioner provided a legally and factually sufficient rationale for rejecting opinions from treating and examining experts on issues within their professional competence?

3.   Given that the burden has shifted to the Commissioner to prove that jobs exist in reasonable numbers that plaintiff can perform, is that burden satisfied by vocational testimony that differs from the Dictionary of Occupational Titles with no foundation, or does the vocational evidence actually establish disability when plaintiff's actual limitations are taken into account?

4.   Must this claim be awarded or remanded for further proceedings?

(Plaintiff's brief).

In the decision of January 28, 2005, the ALJ found the following:

1.   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.   The claimant's degenerative disc disease, history of shoulder surgery and myofascial pain syndrome are considered "severe" based on the requirements in the Regulations (20 CFR § 404.1520(c).

4.   These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.

5.      The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The claimant retains a residual functional capacity to perform a significant range of sedentary work as described above.

7.      The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

8.      The claimant is a "younger individual" (20 CFR § 404.1563).

9.      The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

10.     The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

11.     The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR § 404.1567).

12.     Although the claimant's exertional limitations do not allow him to perform the full range of sedentary work, using Medical Vocational Rule 201.21 and 201.27 as a framework for decision making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as parking lot attendant, a storage facility clerk, and a surveillance system monitor.

13.     The claimant was not under a "disability," as defined in the Social Security Act and regulations. (20 CFR § 404.1520(g)).

(Tr. 34-35).

The Commissioner argues that the ALJ's decision was based on substantial evidence and that the phrase "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 390-401, (1971). Under the Social Security Act, 42 U.S.C. § 405 (g), the scope of review of the Commissioner's final

decision is limited to:  (1) whether the decision of the Commissioner is supported by substantial evidence[2] and (2) whether the legal conclusions of the Commissioner are correct under controlling law.  Myers v. Califano, 611 F.2d 980, 982-83 (4th Cir. 1988); Richardson v. Califano, 574 F.2d 802 (4th Cir. 1978).  "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 390.  Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict.  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).   The Court's scope of review is specific and narrow.   It does not conduct a de novo review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence.   42 U.S.C. § 405 (g) (1982); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability inquiry is well established.  Five questions are to be asked sequentially during the course of a disability determination.  20 C.F.R. §§ 404.1520, 1520a (1988).  An ALJ must consider (1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1), (4) whether the claimant has an impairment which prevents past relevant work and (5) whether the claimant's impairments prevent him from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

---

[2]Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See 20 C.F.R. § 404.1505(a); Blalock, 483 F.2d at 775.

If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. § 404.1503(a).  Hall v. Harris, 658 F.2d 260 (4th Cir. 1981).  An ALJ's factual determinations must be upheld if supported by substantial evidence and proper legal standards were applied.  Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

A claimant is not disabled within the meaning of the Act if he can return to his past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82-62.  The claimant bears the burden of establishing his inability to work within the meaning of the Social Security Act.  42 U.S.C. § 423 (d)(5).  He must make a prima facie showing of disability by showing he was unable to return to his past relevant work.  Grant v. Schweiker, 699 F. 2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  Id. at 191.

## IV.  MEDICAL REPORTS

The undersigned has reviewed the medical records and finds many of the reports relevant to the issues in this case.

On February 17, 1999, plaintiff reported to Jeffrey Buncher, M.D., to treat a workrelated accident (Tr. 295). He complained of neck, left arm, and back pain, and had limited range of motion (Tr. 295-96). Plaintiff was found to suffer from muscle spasms and tenderness upon examination. Plaintiff was diagnosed with cerviocothoracic and lumbosacral spinal sprain/strain, strain/sprain of the left shoulder and probable C5 disc pathology with annular tear or herniation. On March 1, 1999, it was noted that the pain was about the same but aggravated with exertion. Plaintiff was diagnosed with possible carpal tunnel syndrome. On March 15, 1999, it was noted that plaintiff's range of motion had increased; however, any stress was found to cause plaintiff to suffer from muscle spasms and swelling.

In a letter dated April 12, 1999, Dr. Buncher reported plaintiff had improved slowly with time, physical therapy, and the use of rehabilitative exercises but that he still had left shoulder pain which limited his use due to give away and pain. It was also noted that plaintiff suffered from intermitted left upper extremity numbness and radiation to his index finger and thumb. An MRI was recommended.

On May 31, 1999, Dr. Buncher noted in a letter that plaintiff was seen on May 14, 1999, complaining of bad headaches, tingling in his left arm and his left hand was dumb. (Tr. 284). Dr. Buncher noted that plaintiff reported having carried a five to seven pound cooler. Dr. Buchner stated that plaintiff had a limited ability to lift with the left upper extremity. The examination revealed spasms and tenderness to palpation of the left trapezius muscle and from C6 to T1 on the left. He

also noted tenderness to palpation with trigger point in the left anterior scalene and left sternocleidomastoid muscle. Dr. Buchner noted plaintiff had myofascial pain and dysfunction of the muscles and intermittent pain in the cervical spine. The MRI of the cervical spine demonstrated diffuse disc bulging at C5-C6 and C6-C7 with formation of circumferential osteophytes and bilateral exit stenosis. (Tr. 284). Dr. Buchner also noted that an MRI of the left shoulder revealed a partial tear of the supraspinatus tendon as it extends into the attachment.(Tr. 284).

In an office noted dated September 2, 1999, Dr. Buchner noted that plaintiff was having persistent problems with his right shoulder. At this time, plaintiff said that his left shoulder was no longer symptomatic and he thought he could utilize his left shoulder on a full duty status (Tr. 272). On September 22, 1999, plaintiff said he had been doing well until he tried moving a grill during hurricane Floyd. (Tr. 268, 271). All of plaintiff's symptoms flared up, the left trapezius muscle swelled, neck pain and numbness in the left side of the face returned, the pain in the left and right shoulder continued, examination revealed spasms and tenderness to palpation of the left trapezius muscle and levator scapula muscle. On October 8, 1999, Dr. Buchner noted worsened complaints of pain in the cervical spine, shoulder pain the same, experiencing spasms and tenderness to palpation upon examination and tenderness to palpation from C6 to T1 on the left. Plaintiff was continuing with rehabilitation and physical therapy.

On September 2, 1999, Dr. Gerald Shealy of the Charleston Hand Group treated the plaintiff who complained of persistent right shoulder problems, primarily with elevated activities and any type of lifting. Dr. Shealy noted tenderness upon examination.

On October 29, 1999, plaintiff reported to Dr. Buchner that he had surgery on the right shoulder, had tenderness to palpation from C6 to T1 on the left and examination revealed spasms

and tenderness. (Tr. 268). Plaintiff continued regular office visits with Dr. Buchner and Dr. McIntosh, his orthopaedist.

Dr. McIntosh referred plaintiff to Jeffrey Wingate, M.D., of the Carolina Spine Institute for evaluation of neck pain and swelling on February 29, 2000 (Tr. 475). Examination revealed some tenderness in the back, swelling in the left anterior soft tissue, manipulation of the left shoulder resulting in swelling, and scapula winging. Dr. Wingate recommended a nerve conduction study (Tr. 476).

On March 8, 2000, plaintiff had the nerve conduction study, which was consistent with peripheral neuropathy (Tr. 468). Dr. Wingate's impression was left C5-6 disc bulge and right C6-7 HNP. (Tr. 467).

On April 3, 2000, plaintiff underwent a left shoulder arthroscopy (Tr. 218). On May 11, 2000, Dr. McIntosh noted that plaintiff was "doing a little bit better with the shoulder but he is coming along very slowly as anticipated." (Tr. 443). On June 13, 2000, plaintiff reported he was attempting to reach for a calendar when he felt a sharp shooting pain in his left shoulder that had not let up and was unremitting (Tr. 442). An injection seemed to help (Tr. 442). On July 11, 2000, Dr. McIntosh noted plaintiff was "coming along slowly with his shoulder"  and he was still having a fair amount of discomfort in his shoulder. In July 2000, plaintiff had a follow-up appointment with Dr. Buncher, which revealed that he still had some pain in his back, shoulder, and neck (Tr. 253). On August 10, 2000, Dr. McIntosh opined that plaintiff was at maximum medical improvement and was released with permanent restrictions such as not doing any overhead work or lifting more than 20 pounds with each arm. (Tr. 441).

On September 13, 2000, plaintiff reported to Dr. Buncher complaining of sacroiliac pain (Tr. 251). He had some spasms and tenderness, but a straight leg raising test was negative, motor exam was normal, and sensory exam was intact (Tr. 251). Plaintiff had pain and reflexes were 0 on the right and left patella (Tr. 251). Dr. Buncher prescribed physical therapy (Tr. 251). In November 2000, plaintiff reported to Dr. Buncher complaining of severe lower back pain, which he claimed was caused when he leaned over to reach for a vacuum cleaner cord (Tr. 246). Plaintiff was very tender in the back (Tr. 246). Dr. Buncher indicated plaintiff would need a handicapped person's placard for parking (Tr. 247).

On March 14, 2001, plaintiff presented to Dr. Buncher for a follow-up examination (Tr. 355). He had pain in his back and left trapezius muscle with spasms in the low back. Dr. Buncher noted plaintiff had been drinking one to two beers a day secondary to the pain for some relief. Plaintiff requested pain medication and a muscle relaxer to use rather than drinking beer. On physical examination, it was noted plaintiff had spasms and tenderness to palpation of the left trapezius muscle, from C6 to T1 on the right, and L1 to L5 on the right. (Tr. 355). On May 9, 2001, Dr. Buncher, wrote that plaintiff had been totally and permanently disabled as a longshoreman since February 14, 1999 (Tr. 439). In addition, Dr. Buncher indicated that plaintiff could not perform the job of manicurist or pedicurtist as suggested by Teri Schaffer (Tr. 352).

On May 15, 2001, Dr. Wingate completed a Disability Medial Evaluation form indicating his diagnosis was cervical disc disorder and cervical pain. Dr. Wingate opined plaintiff's left shoulder was a source of permanent disability (Tr. 466).

On July 10, 2001, Robert Brabham, Ph.D., performed a psychological and vocational evaluation on plaintiff. (Tr. 477). Plaintiff was not using any device for mobility and said he used

a cane for three weeks following his injury (Tr. 478). He was able to sit, stand, and move around, as needed, without assistance during the examination (Tr. 478). Plaintiff told Dr. Brabham that he was able to care for his personal needs but often experiences problems with many of the activities of daily living such as dressing each day as he is unable to lift his arms above his shoulders. Plaintiff also reported that he generally gets up around 9:00 a.m. and mostly sits and may watch TV. Plaintiff stated that he feeds and cares for his dogs as much as he is able, enters his dogs in dog shows, only occasionally as his medical conditions will allow. Plaintiff also reported that he spends time on the computer occasionally, but reported that, again, he is only able to sit and work for short periods of time, usually less than 15-20 minutes. (Tr. 479). He said that he was unable to maintain social functioning or concentrate well (Tr. 479). Dr. Brabham administered a number of tests (Tr. 479-80). Dr. Brabham's assessment was a pain disorder with both psychological factors (depression) and a general medical condition (orthopedic injuries). Dr. Brabham further noted that his failure to recover, and the severe limitations that he experiences have also resulted in a Dysthymic Disorder, a period of depression that has persisted for a period of more than two years since his injury. (Tr. 481). Dr. Brabham opined that plaintiff's combination of impairments "clearly imposes severe functional limitations in his ability to perform work-related functions due to deficits in reasoning, and in making occupational, personal or social adjustments, as well as from physical limitations his injury imposes." (Tr. 481). Dr. Brabham noted several major errors in the vocational assessment prepared by David Price and a report issued by Nancy Favaloro. (Tr. 482). Dr. Brabham concluded it is his "strong opinion that he is unable to engage in competitive employment, and that no significant numbers of jobs exist which can take into consideration his particular combination of emotional, mental, and physical limitations." (Tr. 483). Dr. Brabham opined that plaintiff falls in the category

-11-

of being totally and permanently disabled because combination of limited residual vocational skills are so limited in quality, dependability, or quantity that a reasonable market simply does not exist for them in the general economy." (Tr. 483).

On August 3, 2001, plaintiff presented to Dr. Buncher complaining of pain in his left lateral thigh (Tr. 350). Examination revealed tenderness to palpation of the left anterior tibialis muscle (Tr. 350). On August 18, 2001, Dr. Buncher wrote that plaintiff was able to perform sedentary activities, could sit or stand for short periods of time, and could not lift (Tr. 485). He also indicated that plaintiff currently needed to use a cane due to pain in the anterior tibialis muscle (Tr. 486). He wrote that plaintiff had the ability to grasp and manipulate with each hand, but the ability to do so was limited by bilateral shoulder pain (Tr. 486).

On October 9, 2001, Elizabeth Rittenberg, M.D., examined plaintiff at the Commissioner's request (Tr. 489-90). Dr. Rittenberg notes that during the physical examination, plaintiff "cooperates fully, even when it is noticeably hurting him to do the movements asked." (Tr. 489). Examination revealed no atrophy, normal strength, and intact sensation (Tr. 489). Range of motion in the back was normal (Tr. 489). There was some back tenderness (Tr. 489). Plaintiff could toe walk, but had some trouble heel walking on the left (Tr. 489). Grip strength was normal, and plaintiff was able to do gross and fine manipulation (Tr. 489). His right shoulder range of motion was slightly restricted, and his left shoulder range of motion was restricted (Tr. 490). Dr. Rittenberg opined that plaintiff would have difficulty standing for long periods of time, lifting more than 15 pounds, pushing, pulling, performing any overhead activities, specifically unable to do overhead activities with his left arm because of shoulder limitations, and would have difficulty carrying out repetitive movements of his shoulder.(Tr. 490).

On January 4, 2002, plaintiff reported to Dr. Buncher complaining of pain in the low back and the left sacroiliac joint (Tr. 345). He said he had no leg pain (Tr. 345). He had back pain (Tr. 345). He walked with a limp and used a cane (Tr. 345). On January 24, 2002, Dr. Buncher signed an application renewal of a handicapped person's vehicle placard (Tr. 344). He indicated plaintiff had a temporary impairment in mobility and was using a cane (Tr. 344).

On April 17, 2002, plaintiff presented to Randi Popp, M.D., at the request of vocational rehabilitation (Tr. 502). Plaintiff complained of pain and depression (Tr. 502). It was noted that plaintiff described his depression as "difficulty resting, frustrating" and that he feels he "can't do anything to help himself and didn't think he'd be in these shoes at age 43." (Tr. 502). Examination was essentially normal (Tr. 503). Specifically, plaintiff's upper extremities had full range of motion, but there was some tenderness in the left shoulder (Tr. 502). Dr. Popp's diagnosis was neurotic depression, pain in joint involving shoulder region and back pain. (Tr. 503).

On June 11, 2002, Mark Beale, M.D., evaluated plaintiff's mental status at the request of the Commissioner (Tr. 504-06). Plaintiff told Dr. Beale that he played with his dogs, watched television, and was inactive during a typical day (Tr. 505). He said he drank about 12 beers a week, primarily to help himself sleep (Tr. 505). Mental status exam showed he was in no distress and was able to walk unassisted (Tr. 505). His mood was sad (Tr. 505). His concentration and memory were good (Tr. 505). His judgment was fair and there was no sign of psychosis (Tr. 505). Dr. Beale diagnosed posttraumatic stress disorder, major depressive disorder in partial remission, and status post remote head injury (Tr. 505).

On September 10, 2002, Dr. Buncher opined that plaintiff could not return to his vocation (Tr. 337-43). Plaintiff continued to complain of pain and depression (Tr. 335-36).

-13-

On March 27, 2003, plaintiff told Dr. Buncher that he was able to sit for 20 minutes, stand for 10 minutes, and walk for 15 to 20 minutes before his back pain became worse (Tr. 331). On two occasions in May, plaintiff sought treatment when he had exacerbation of his pain (Tr. 327). On May 9, 2003, plaintiff told Dr. Buncher that a radiologist interpreting an MRI had said that he had a tear in his left rotator cuff (Tr. 326). His left shoulder was in a brace (Tr. 326).Dr. Buncher's assessment was chronic myofascial pain and dysfunction of the left trapezius muscle and chronic low back pain which persists with radiation to the lower extremities. (Tr. 326).

On May 2, 2003, plaintiff reported to Dr. McIntosh's physician's assistant, Kelly Bailey (Tr. 235). Mr. Bailey noted plaintiff had limited cervical motion regarding rotation to the right, side bending to th right and extension that seems to cause mild pain in the left trapezium. Plaintiff was placed in a shoulder immobilizer and scheduled for a MRI. (Tr. 235). On May 15, 2003, plaintiff received an injection in his shoulder. On July 3, 2003, Dr. McIntosh noted that  "basically, it is back to where it was."  (Tr. 232). Dr. McIntosh also thought plaintiff might have been developing some early signs of carpal tunnel syndrome (Tr. 229).

On September 23, 2003, plaintiff reported to Dr. Buncher for treatment of his neck, muscle, back, and shoulder pain (Tr. 244). Dr. Buncher noted that the physical examination revealed spasm, and tenderness to palpation and motion and "his left shoulder pops when he attempted to elevate it, and it was exquisitely painful." (Tr. 244). His assessment was chronic pain in the cervicothroacic spine, chronic myofascial pain in the left trapezius muscle; chronic shoulder pain with limited range of motion; recurrent low back pain; and depression (Tr. 244).

On January 23, 2004, Dr. Buncher examined plaintiff (Tr. 313). Dr. Buncher noted plaintiff's recurring complaints and also that a Phalen's test was positive on the left (Tr. 313). In addition he

-14-

noted plaintiff had pain in both legs (Tr. 313). In February 2004, plaintiff had positive Phalen's tests

on the left and plaintiff "continues to require a cane for ambulation."(Tr. 312).

On August 6, 2004, Dr. Buncher completed a residual functional capacity assessment (Tr.

304-08). He found plaintiff could sit, stand, or walk 20 minutes at one time, each; lift up to 10

pounds occasionally, but no more; not use his hands or feet for repetitive action; never squat, crawl,

use his hands over the shoulder, or stoop; occasionally kneel; never work around unprotected

heights, moving machinery, or extreme heat; and occasionally work around noise, vibration, dust,

fumes, and gases (Tr. 304-05). He also indicated that plaintiff required change of position (Tr. 306).

Dr. Buncher also indicated plaintiff's pain would affect his ability to concentrate and would require

breaks or rest periods during the day (Tr. 307). In addition, he indicated plaintiff's medication caused

somnolence and drowsiness (Tr. 308).

## V.  PLAINTIFF'S SPECIFIC ARGUMENTS

Plaintiff argues that the decision improperly discounts expert opinions from treating and

examining sources without applying the proper legal standards. Specifically, plaintiff argues that the

decision notes that Dr. Wingate, treating orthopedist, certified plaintiff as totally disabled and that

Dr. Buncher, primary care physician, imposed numerous exertional and non-exertional limitations

by questionnaire completed August 6, 2004, and by letter of August 18, 2001. Plaintiff argues that

while the decision does find limitations, it rejects much of the pertinent evidence from experts on

issues within their professional competence. Plaintiff argues that the decision gives Dr. Wingate no

significant weight because he last examined plaintiff in March 2000 and because "the medical

evidence of record for that time fails to support such a restrictive assessment." Plaintiff argues this

rationale fails to recognize that Dr. Wingate's opinion is itself medial evidence for that period of time. Plaintiff argues the ALJ erroneously found that Dr. Buncher's opinions are not supported by objective medical evidence of record. Further, plaintiff argues that Dr. Rittenburg agrees that plaintiff is limited in walking and in using his arm and shoulders which is not in contradiction to Dr. Buncher's opinion. Lastly, plaintiff argues that "the picture is further complicated by the decision's distortion and rejecting of the opinions of Dr. Brabham as a consulting medical source when he provided a vocational and psychological evaluation." Plaintiff argues that "Dr. Brabham's conclusions, that Mr. Nesmith has a significant psychological impairment and is unemployable in the competitive economy, are not even mentioned in the decision."

Defendant argues in response that the ALJ's reasons for rejecting Dr. Wingate's and Dr. Buncher's opinions of disability were reasonable. Defendant argues that the ALJ noted that Dr. Wingate had opined that plaintiff had been disabled since 1999 but had not examined plaintiff for more than a year when he made the assessment. Further, defendant asserts that the ALJ gave Dr. Buncher's opinion that plaintiff was disabled little weight for two principle reasons. First, defendant argues the ALJ noted the Dr. Buncher's assessment focused on plaintiff's subjective complaints, rather than objective medical testing. Second, defendant contends Dr. Buncher noted extensive tenderness and spasms, and limited range of motion, while no other examining or treating physician ever noted muscle spasms and consultative examinations indicated full range of motion in the shoulders. Defendant asserts that the ALJ properly relied on Dr. Rittenberg's assessment which was "completely consistent with the medical evidence." Defendant does not address plaintiff's argument that the ALJ failed to discuss Dr. Brabham's conclusions that plaintiff has a significant psychological impairment and is unemployable in the competitive economy.

The opinion of a physician will be given controlling weight if it is supported by medically accepted clinical and laboratory diagnostic techniques and is consistent with the other evidence in the record.  20 C.F.R. § 404.1527(d) (1997); Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (although not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it.); Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983)(a treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.").  Conversely, if a physician's opinion is not supported by medically-accepted clinical and laboratory diagnostic techniques and is not consistent with the other evidence in the record, it will not be given controlling weight.  In evaluating how much weight should be given to the opinion of a physician, the nature and extent of the treatment relationship will be taken into account.  Id.  An ALJ, therefore, must explain his reasons for disregarding a positive opinion of a treating physician that a claimant is disabled. DeLoatche v. Heckler, 715 F.2d 148 (4th Cir. 1983).

This court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, Richardson, 402 U.S. at 390.  Even where the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision, Blalock, 483 F.2d at 775.  The Commissioner is charged with resolving conflicts in the evidence, and this court cannot reverse that decision merely because the evidence would permit a different conclusion. Shively  v. Heckler, 739 F.2d at 989.

-17-

A review of the hearing decision reveals the ALJ concluded the following with respect to the

treating physician's opinion:

> On May 9, 2001, Dr. Buncher, the claimant's treating physician, opined that the claimant was totally and permanently disabled from his prior work as a longshoreman. He also reported that the claimant's ability to perform work was quite limited and that the claimant could only perform sedentary work but that he could sit or stand for more than short periods of time, lift any weight, or grasp or manipulate with his hands. On November 21, 2001, and January 24, 2002, Dr. Buncher certified that the claimant was disabled so as to require a handicapped license plate. However, he only certified that the claimant suffered from a temporary disability, which was expected to last only 8 weeks. On August 6, 2004, Dr. Buncher revised his medical opinion and found that the claimant could stand, walk, and sit for only 20 minutes and could occasionally lift 10 pounds with no grasping, repetitive actions with his extremities, or postural activities. The claimant was also found to have several environmental limitations. After a thorough review of the medical evidence, the undersigned finds that the objective medical evidence of record fails to support Dr. Buncher's restrictive medical opinions. The undersigned notes that Dr. Buncher's own treatment notes generally focus on the claimant's subjective complaints and objective medical testing results were not often reported. Dr. Buncher's medical records generally reveal only that the claimant complained of tenderness upon palpation of his shoulder, neck, and back and suffered from muscle spasms and a limited range of motion. However, when looking at the medical record on the whole, the undersigned cannot help but notice that no other examining or treating physician ever noted any muscle spasm upon examination. Additionally, upon consultative examination on October 2001 and April 2002, the claimant was found to have a full range of motion of his shoulders. Therefore, as the weight of the objective medical evidence fails to support the overly restrictive residual functional capacities and medical opinions of Dr. Buncher, they are accorded more than minimal weight. As the medical evidence of record generally supports the medical opinions of Dr. Rittenberg, a consultative examiner, her medical opinions are accorded more than minimal weight as can be seen in the claimant's residual functional capacity as described above. The undersigned has given more weight to her opinions as she is a specialist in physical medicine and rehabilitation and as her examination was more comprehensive and germane to the issue of the claimant's residual functional capacity. Diagnostic studies, in particular EMG/NCS are

also found to be more consistent with the results of Dr. Rittenberg. However, the undersigned accords the medical opinions of Dr. Brabham, also a consultative examiner, not more than minimal weight as his medical opinions regarding the claimant's mental and physical limitations are without substantial medical support. The undersigned notes that Dr. Brabham viewed the claimant on only one occasion and did not have the benefit of a longitudinal treating relationship with the claimant. Additionally, the undersigned finds after a thorough review of the evidence of record, that Dr. Brabham's medical opinions are primarily based upon the claimant's subjective complaints and to the claimant's objective medical findings.

(Tr. 31-32).

The undersigned finds that there is no conflicting medical evidence cited by the ALJ which could justify ignoring the opinions of Drs. Wingate, Buncher, and Brabham all of which found the plaintiff to be disabled. There is no contradictory evidence from an examining or treating physician put forth by the ALJ to completely ignore the disability determination and functional assessment of plaintiff by the doctors. Dr. Rittenberg's opinion, on which the ALJ relies, actually concluded that plaintiff could not lift greater than fifteen pounds, and could not do any pushing, pulling, or any overhead activities. Dr. Rittenberg also concluded that plaintiff would be unable to do overhead activities with his left arm because of his shoulder limitations and it would be difficult for him to carry out significant repetitive movements of his shoulder secondary to the limitations there. The ALJ found plaintiff retains the ability to lift 20 pounds occasionally and 10 pounds frequently with his right extremity and 10 pounds occasionally and lesser weights frequently with his left upper extremity. Additionally, the ALJ found plaintiff could push or pull with his left upper extremity for 10% of the workday but made no mention of the right, and concluded plaintiff could "perform only occasional reaching with his right upper extremity and can reach for only 10% of his workday with

his left upper extremity." The ALJ's limitations are in contradiction to Dr. Rittenberg's report on which the ALJ stated he was relying as opposed to the treating physician's reports.

The undersigned finds there is not substantial evidence to support the ALJ's decision with respect to the treating physician's opinions and as to the residual functional capacity conclusions. Further, the ALJ failed to discuss Dr. Brabham's opinion that plaintiff is "unable to engage in competitive employment, and that no significant number of jobs exist which can take into consideration his particular combination of emotional, mental, and physical limitations."(Tr. 483). Dr. Brabham further opined that plaintiff "falls in the category of being totally and permanently disabled because his combination of limited residual vocational skills are so limited in quality, dependability, or quantity that a reasonable market simply does not exist for them in the general economy. His long-term vocational prognosis is quite poor, in my opinion, and I regret to predict that he will not be able to return to work." (Tr. 483). The ALJ only stated that he "accords the medical opinions of Dr. Brabham, also a consultive examiner, no more than minimal weight as his medical opinions regarding the claimant's mental and physical limitations are without substantial medical support." (Tr. 32). The ALJ also concluded that Dr. Brabham's medical opinions are based primarily on plaintiff's subjective complaint and not objective medical findings. However, Dr. Brabham preformed a psychological evaluation and a vocational evaluation on plaintiff administering a number of tests, as well as, reviewing plaintiff's medical reports from other physicians. It is interesting, as plaintiff's attorney pointed out, that Dr. Brabham was actually the ALJ's vocational expert in plaintiff's first hearing. Now, the ALJ states that he accords little weight to Dr. Brabham's opinion and does not recognize that Dr. Brabham is a certified vocational expert in his opinion only referring to Dr. Brabham as a consultative examiner. Additionally, the ALJ failed to discuss Dr.

-20-

Brabham's opinion that plaintiff is unable to engage in gainful employment. As previously noted, defendant did not address this issue in his brief.

In summary, there is a treating orthopedist, a treating medical physician, and a psychological and vocational expert all opining that plaintiff is disabled from gainful employment. Additionally, the medical report of one time consultative examiner, Dr. Rittenberg, which the ALJ stated he was according substantial weight, concluded plaintiff would find it difficult to stand for long periods of time, lift greater than fifteen pounds, pushing, pulling, or any overhead activities . . . unable to do overhead activities with his left arm because of his shoulder limitations." However, the ALJ failed to include all of Dr. Rittenberg's limitations in his hypothetical to the VE. The ALJ concluded plaintiff retained the ability to engage in a greater range of activities than set forth even by the one time consultative examiner whom he stated he was according greater weight than to the treating physician's opinions. Accordingly, the undersigned concludes there is not substantial evidence to support the ALJ's decision based on the treating and examining physician's opinions, the vocational expert's opinion, and the limitations set forth by the consultative examiner. Thus, reversal is appropriate and the plaintiff is entitled to benefits. Because reversal is warranted, it is unnecessary for this court to consider the other issues raised by the plaintiff.

## VI. CONCLUSION

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, Richardson v. Perales, 574 F.2d at 802. Even where the plaintiff can produce conflicting evidence which might have resulted in a contrary

-21-

decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision, <u>Blalock,</u>  483 F.2d at 775.

The undersigned finds that the ALJ's decision was not supported by substantial evidence for the reasons discussed.  It is, therefore,

RECOMMENDED that the Commissioner's decision be REVERSED.

Respectfully submitted,

<u>s/Thomas E. Rogers, III</u>
Thomas E. Rogers, III
United States Magistrate Judge

July <u>30</u>, 2007
Florence, South Carolina

**The parties' attention is directed to the important notice on the next page.**